## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

### BLUEFIELD DIVISION

DONALD BLANKENSHIP,

      Plaintiff,

v.                                 CIVIL ACTION NO. 1:20-cv-00322

ANDREW SAUL,
Commissioner of Social Security,

      Defendant.

### PROPOSED FINDINGS & RECOMMENDATION

Plaintiff Donald Blankenship ("Claimant") seeks review of the final decision of the Commissioner of Social Security (the "Commissioner") denying his application for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381–83f. (ECF No. 2.) By standing order entered on January 4, 2016, and filed in this case on May 8, 2020, this matter was referred to the undersigned United States Magistrate Judge to consider the pleadings and evidence and to submit proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). (ECF No. 3.) Presently pending before this Court are Claimant's motion for judgment on the pleadings and supporting memorandum (ECF Nos. 13, 14) and the Commissioner's Brief in Support of Defendant's Decision (ECF No. 17).

Having fully considered the record and the arguments of the parties, the undersigned respectfully **RECOMMENDS** that the presiding District Judge **DENY** Claimant's request to reverse the Commissioner's decision (ECF No. 14), **GRANT** the

Commissioner's request to affirm his decision (ECF No. 17), **AFFIRM** the final decision of the Commissioner, and **DISMISS** this action from the Court's docket.

## I.    BACKGROUND

### A. Information about Claimant and Procedural History of Claim

Claimant was 39 years old at the time of his alleged disability onset date and 52 years old on the date of the decision by the Administrative Law Judge ("ALJ"). (*See* Tr. at 344.)[1]  He completed the ninth grade. (*Id.* at 367.)  He reported that he has never worked. (*Id.* at 366.)  Claimant alleges that he became disabled on February 5, 2006, due to arthritis, liver disease, mental health issues, an enlarged spleen, low white blood cell and platelet counts, and "esphogel virius." (*Id.*)

Claimant protectively filed his application for benefits on September 27, 2016. (*Id.* at 117, 344–50.)  His claim was initially denied on May 1, 2017, and again upon reconsideration on July 13, 2017. (*Id.* at 266–71, 278–84.)  Thereafter, on July 24, 2017, Claimant filed a written request for hearing. (*Id.* at 285–88.)  An administrative hearing was held before an ALJ on November 27, 2018, in Bluefield, West Virginia, with the ALJ appearing from Charleston, West Virginia. (*Id.* at 157–91.)  On January 31, 2019, the ALJ rendered an unfavorable decision. (*Id.* at 114–34.)  Claimant then sought review of the ALJ's decision by the Appeals Council on March 15, 2019. (*Id.* at 341–43.)  The Appeals Council denied Claimant's request for review on March 19, 2020, and the ALJ's decision became the final decision of the Commissioner on that date. (*Id.* at 1–7.)

Claimant timely brought the present action on May 7, 2020, seeking judicial review of the ALJ's decision pursuant to 42 U.S.C. § 405(g). (ECF No. 2.)  The Commissioner filed an Answer (ECF No. 11) and a transcript of the administrative proceedings (ECF No.

---

[1] All references to "Tr." refer to the Transcript of Proceedings filed in this action at ECF No. 12.

12).    Claimant subsequently filed his motion for judgment on the pleadings and supporting memorandum (ECF Nos. 13, 14), and in response, the Commissioner filed his Brief in Support of Defendant's Decision (ECF No. 17).  As such, this matter is fully briefed and ready for resolution.

### B. Relevant Medical Evidence

The undersigned has considered all evidence of record, including the medical evidence, pertaining to Claimant's arguments and summarizes it here for the convenience of the United States District Judge.

### 1. Evidence of Treatment for Right Shoulder Impairment Considered by ALJ

On January 12, 2018, Claimant presented to the emergency room at a local hospital after he "slipped and fell onto his right arm" while walking in a grocery store parking lot. (Tr. at 884.)  Upon physical examination, Claimant had bone tenderness, bruising, limited range of motion, pain, soft tissue tenderness, and swelling in his right shoulder and upper arm.  (*Id.* at 885.)  Claimant was diagnosed with a "Closed fracture of right proximal humerus," prescribed pain medication and a sling, and instructed to follow up with the orthopedic surgeon who attended to him in the emergency room.  (*Id.* at 892.) Two days later, on January 14, 2018, Claimant presented to the emergency room at a different hospital, complaining that "his [right shoulder] pain at home was intolerable" and "was getting worse."  (*Id.* at 996.)  A physical examination revealed bruising and swelling in Claimant's right arm.  (*Id.* at 997.)  Claimant was admitted to be monitored prior to his surgery the next morning.  (*Id.* at 998.)  He underwent a right shoulder hemiarthroplasty on January 15, 2018.  (*Id.* at 1003–04.)

Shortly after his surgery, on January 22, 2018, Claimant returned to the emergency room for pain and redness in his right shoulder.  (*Id.* at 876.)  He complained about his

3

orthopedic surgeon and requested not "to see him again unless he just has to." (*Id.*)  A physical examination revealed bruising, pain, soft tissue tenderness, swelling, and redness with "mild drainage" around the surgical staples.  (*Id.* at 877.)  Claimant was diagnosed with right shoulder pain and a surgical wound infection.  (*Id.* at 881.)  He again presented to the emergency room, this time at a different hospital, on February 13, 2018, for right shoulder pain.  (*Id.* at 1008.)  He reported that "he has not been wearing his shoulder immobilizer today because unable to reapply by himself and no one available to assist." (*Id.*)  A physical examination revealed pain and limited active range of motion due to pain in Claimant's right shoulder.  (*Id.*)  Claimant was discharged home and directed to follow up with his orthopedic surgeon "tomorrow as scheduled." (*Id.* at 1010.)

On February 19, 2018, Claimant presented to the emergency room at a local hospital "for treatment of depression," but he also reported "constant pain in [his] right shoulder and right upper arm" since having his shoulder surgery.  (*Id.* at 863.)  Claimant stated that "he is just in so much pain that he is not sure what to do." (*Id.* at 866.)  He was instructed to follow up with his orthopedist and was given contact information for "an orthopedist that occasionally does revisions." (*Id.* at 867.)  Several days later, on February 23, 2018, he returned to the emergency room and complained of chronic shoulder pain "that makes him [suicidal]." (*Id.* at 826 (emphasis deleted).)  A physical examination revealed tenderness in his right shoulder.  (*Id.* at 827.)  Claimant told a physician's assistant that he had undergone shoulder surgery in January and used a shoulder immobilizer but did not receive physical therapy.  (*Id.* at 823.)  The physician's assistant explained, "He is not going to do well without [physical] therapy." (*Id.* at 825.)  He noted that he "had a lengthy discussion with [Claimant]" and "will try to contact his orthopedic physician next week." (*Id.*)  Claimant was discharged from the hospital on

March 1, 2018, "with the plan of going to [a homeless shelter] so he could seek a second opinion on his shoulder." (*Id.* at 833.)

Claimant presented to a different hospital's emergency room on March 14, 2018, again complaining of shoulder pain and mental health issues and "Requesting to go to a place that offers shoulder rehab/therapy." (*Id.* at 1015.) A physical examination revealed pain, tenderness, and decreased range of motion in Claimant's right shoulder. (*Id.* at 1016.) Although he initially refused to return to the hospital that had discharged him on March 1, 2018, no beds were available at the hospital where he wanted to be treated, so he was transferred to the hospital where he had recently been seen. (*Id.* at 1015–16, 1018.) The attending physician there wrote that Claimant "never went to the [homeless] shelter" when he was discharged on March 1, 2018, and instead "presented immediately to the emergency room [at another hospital] and got himself admitted . . . where he has been for the past 2 weeks until a couple days ago." (*Id.* at 833.) The attending physician explained that Claimant "has been on a mission to find a hospital that will keep him for a long amount of time" and "is malingering significantly to avoid homelessness." (*Id.*) A hospitalist noted that while Claimant used a shoulder immobilizer, he "has yet to follow up with any orthopedic surgeon or go to any physical therapy" since his shoulder surgery. (*Id.* at 837.) A physical examination revealed "limited range of motion of the right upper extremity." (*Id.* at 838.) Claimant was given "several exercises he can be doing on his own" and instructed "to use the immobilizer less and less over the next few days and weeks." (*Id.* at 839.)

Just over a week later, on March 22, 2018, Claimant again presented to the emergency room, complaining of "severe shoulder pain" that prevented him from performing daily activities. (*Id.* at 859.) He denied numbness or tingling, fever or chills,

neck or back pain, and recent injuries. (*Id.*) He reported that he had seen his orthopedic surgeon the previous day and "received a referral for physical therapy and a prescription for Tylenol." (*Id.*) A physical examination revealed "decreased range of motion of the right upper extremity at the shoulder" and "tenderness [to] palpation along the anterior lateral of the right shoulder." (*Id.* at 860.) Claimant requested "a referral to inpatient rehab" and "admitted to [the hospital's social services worker] that he is homeless." (*Id.*) The attending physician wrote, "He is currently going to be referred to outpatient physical therapy so I do not think there is anything else to do with the shoulder. I feel that this is mainly because he was homeless." (*Id.*) Claimant presented to the emergency room at a different hospital on March 28, 2018, complaining of shoulder pain and "anxiety, depression, [and] homicidal ideation" about his orthopedic surgeon and the providers who had treated him during his emergency room visits. (*Id.* at 1021.) Claimant was diagnosed with "Alcohol abuse with intoxication delirium" and "Pain in right shoulder" and discharged home. (*Id.* at 1024.)

On May 7 and 9, 2018, Claimant attended two physical therapy sessions. (*Id.* at 1029–30.) However, he was later discharged from physical therapy because he "cancelled [his] final two sessions" and "Did not call back to reschedule." (*Id.* at 1031.) On May 13, 2018, he presented to the emergency room, complaining of shoulder pain and reporting that "he is concerned he has a blood clot." (*Id.* at 840.) He also stated that his orthopedic surgeon "will not see him anymore" and expressed frustration that he could not find another doctor to treat him. (*Id.*) The nurse practitioner noted that Claimant "and his father are very upset and fussing at me." (*Id.*) A physical examination revealed pain, soft tissue tenderness, and swelling in Claimant's right shoulder. (*Id.* at 841.) He was directed to rest, use his sling, and follow up with an orthopedist. (*Id.* at 842.)

6

Claimant presented to an orthopedic surgeon on October 16, 2018, to be evaluated for his right shoulder pain.  (*Id.* at 950.)  He related that he "is very frustrated by his lack of improvement with function and has had recurrent pain and symptoms regarding the right shoulder since the surgery." (*Id.*)  A physical examination revealed "severe weakness on rotator cuff testing" and "very minimal strength on resisting external rotation." (*Id.* at 951.)    The orthopedic surgeon recommended "a revision to a reverse shoulder arthroplasty" and suggested an evaluation by another orthopedic surgeon in the same facility.  (*Id.*)  Claimant presented to the second evaluation on October 26, 2018, and stated that he "did not regain as much motion as he would like to have" after completing two four-week courses of physical therapy after his shoulder surgery.  (*Id.* at 969.)  He reported that his pain had "settled down pretty good," and "His primary concern is limited function." (*Id.*)  Claimant had reduced range of motion and decreased muscle strength in his right shoulder upon physical examination.  (*Id.*)  The orthopedic surgeon diagnosed claimant with a "Probable deficient rotator cuff on the right shoulder" and noted, "He is also missing the noted tuberosities, which usually means a little poor result, and he does have some partial anterior escape." (*Id.* at 970.)  He recommended "considering revision to a reverse total shoulder arthroplasty" with the goal of restoring Claimant's range of motion "up to 90 degrees, possibly further." (*Id.*)  He tentatively scheduled the surgery for February 6, 2019.  (*Id.*)

   2. *Evidence of Treatment for Right Shoulder Impairment Submitted to Appeals Council*

Claimant presented to his primary care provider on April 25, 2018, and requested a referral to an orthopedic surgeon because he "hasn't been able to schedule an appointment with [the orthopedic surgeon who performed his shoulder surgery] despite

. . . trying several times." (*Id*. at 147.) Upon physical examination, the nurse practitioner observed that Claimant "has [his] right shoulder in [a] sling" and "is unable to move [his right arm] laterally." (*Id*.) She also noted that "He has limited use of his hand" and "reports being unable to flip off a light switch." (*Id*.) Claimant was instructed to "take his records to [the orthopedic surgeon who performed his shoulder surgery] and get his [appointment]" and prescribed a topical pain gel. (*Id*. at 149.) On May 14, 2018, Claimant returned to his primary care provider "for a travel form to be completed" for his appointment with an orthopedic surgeon. (*Id*. at 141.) A physical examination revealed shoulder "abnormalities," and Claimant had his "right shoulder in [a] sling." (*Id*. at 143.)

On February 6, 2019, Claimant underwent a "Revision of the right shoulder hemiathroplasty to a reverse total shoulder." (*Id*. at 75–78.) At a postoperative follow-up appointment on March 7, 2019, Claimant reported that he had been cleaning his incision, complying with his range-of-motion restrictions, and completing his exercises. (*Id*. at 72.) A physical examination revealed "a well-healed surgical incision at the right shoulder" and "good motion at the elbow, wrist and hand." (*Id*.) Claimant was instructed to continue with the exercises and not lift his arm overhead "for at least another 2–3 weeks." (*Id*.)

*3. Opinion Evidence Submitted to Appeals Council*

The orthopedic surgeon who performed Claimant's February 6, 2019 shoulder surgery completed a "Medical Source Statement of Ability To Do Work-Related Activities (Physical)" checkbox form for Claimant on April 1, 2019. (*Id*. at 8–13.) As relevant here, he opined that Claimant could never lift or carry any amount of weight with his right arm. (*Id*. at 8.) He elaborated, "No Lifting, carrying, pushing, pulling on Right Arm, hand over 3lb for 4 month [sic], No overhead use of Right Arm. This will take about a year to rehab

8

to [maximum medical improvement]." (*Id.* at 9.)  The orthopedic surgeon further opined that Claimant could occasionally reach, handle, finger, feel, and push/pull "under 1-2 lbs" with his right arm.  (*Id.* at 10.)  He opined that Claimant could never use his right arm to climb ladders or scaffolds or to crawl and could not use his right arm if around unprotected heights or moving mechanical parts or while operating a motor vehicle.  (*Id.* at 11–12.)  He also opined that Claimant should not use a handrail with his right hand and should do "Nothing overhead." (*Id.* at 13.)  Lastly, the orthopedic surgeon opined that the limitations he specified have lasted or will last for twelve consecutive months.  (*Id.*)

### C. Sequential Evaluation Process

An individual unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months" is considered to be disabled and thus eligible for benefits.  42 U.S.C. § 423(d)(1)(A).  The Social Security Administration has established a five-step sequential evaluation process to aid in this determination.   20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); *Lewis v. Berryhill*, 858 F.3d 858, 861 (4th Cir. 2017).  The ALJ proceeds through each step until making a finding of either "disabled" or "not disabled"; if no finding is made, the analysis advances to the next step.  20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).  "The ultimate burden to prove disability lies on the claimant." *Preston v. Heckler*, 769 F.2d 988, 990 n.* (4th Cir. 1985); *see Bird v. Comm'r of Soc. Sec.*, 699 F.3d 337, 340 (4th Cir. 2012) ("To establish eligibility for . . . benefits, a claimant must show that he became disabled before his [date last insured].").

At the first step in the sequential evaluation process, the ALJ determines whether the claimant is engaged in "substantial gainful activity." 20 C.F.R. §§ 404.1520(a)(4)(i),

416.920(a)(4)(i).  If the claimant is not engaged in substantial gainful activity, the ALJ moves on to the second step.

At the second step, the ALJ considers the combined severity of the claimant's medically determinable physical and mental impairments.  *Id.* §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii).  The ALJ gleans this information from the available medical evidence.  *See Mastro v. Apfel*, 270 F.3d 171, 177 (4th Cir. 2001).  An individual impairment or combination of impairments that is not classified as "severe" and does not satisfy the durational requirements will result in a finding of "not disabled."   20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii); *Mascio v. Colvin*, 780 F.3d 632, 634–35 (4th Cir. 2015).

Similarly, at the third step, the ALJ determines whether the claimant's impairment or combination of impairments meets or is medically equal to the criteria of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.  *See* 20 C.F.R. §§ 404.1520(a)(4)(iii),  416.920(a)(4)(iii).   "A claimant is entitled to a conclusive presumption that he is impaired if he can show that his condition 'meets or equals the listed impairments.'"  *Radford v. Colvin*, 734 F.3d 288, 291 (4th Cir. 2013) (quoting *Bowen v. City of New York*, 476 U.S. 467, 471 (1986)).

"If the first three steps do not lead to a conclusive determination, the ALJ then assesses the claimant's residual functional capacity" ("RFC") before proceeding to the fourth step.  *Mascio*, 780 F.3d at 635; *see* 20 C.F.R. §§ 404.1520(e), 416.920(e).  The claimant's RFC reflects "her ability to perform work despite her limitations."  *Patterson v. Comm'r of Soc. Sec.*, 846 F.3d 656, 659 (4th Cir. 2017); *Monroe v. Colvin*, 826 F.3d 176, 179 (4th Cir. 2016) (defining claimant's RFC as "the most the claimant can still do despite physical and mental limitations that affect his ability to work" (alterations and

internal quotation marks omitted)); *see* 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1).  The ALJ "first identif[ies] the individual's functional limitations or restrictions and assess[es] his or her work-related abilities on a function-by-function basis," then "define[s] the claimant's RFC in terms of the exertional levels of work." *Lewis*, 858 F.3d at 862.  "In determining a claimant's RFC, the ALJ must consider all of the claimant's medically determinable impairments . . . including those not labeled severe" as well as "all the claimant's symptoms, including pain, and the extent to which his symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence." *Monroe*, 826 F.3d at 179 (alterations and internal quotation marks omitted); *see* 20 C.F.R. §§ 404.1545(a), 416.945(a).

When the claimant alleges a mental impairment, the first three steps of the sequential evaluation process and the RFC assessment are conducted using a "special technique" to "evaluate the severity of [the] mental impairment[]."  20 C.F.R. §§ 404.1520a(a), 416.920a(a); *see Patterson*, 846 F.3d at 659.  Considering the claimant's "pertinent symptoms, signs, and laboratory findings," the ALJ determines whether the claimant has "a medically determinable mental impairment(s)" and "rate[s] the degree of functional limitation resulting from the impairment(s)" according to certain criteria.  20 C.F.R. §§ 404.1520a(b), 416.920a(b); *see id.* §§ 404.1520a(c), 416.920a(c).  "Next, the ALJ must determine if the mental impairment is severe, and if so, whether it qualifies as a listed impairment." *Patterson*, 846 F.3d at 659; *see* 20 C.F.R. §§ 404.1520a(d), 416.920a(d).  "If the mental impairment is severe but is not a listed impairment, the ALJ must assess the claimant's RFC in light of how the impairment constrains the claimant's work abilities." *Patterson*, 846 F.3d at 659.

After assessing the claimant's RFC, the ALJ at the fourth step determines whether the claimant has the RFC to perform the requirements of her past relevant work. 20 C.F.R. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv); *Monroe*, 826 F.3d at 180. If she does not, then "the ALJ proceeds to step five." *Lewis*, 858 F.3d at 862.

The fifth and final step requires the ALJ to consider the claimant's RFC, age, education, and work experience in order to determine whether she can make an adjustment to other work. 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v). At this point, "the burden shifts to the Commissioner to prove, by a preponderance of the evidence, that the claimant can perform other work that 'exists in significant numbers in the national economy.'" *Lewis*, 858 F.3d at 862 (quoting *Mascio*, 780 F.3d at 635). "The Commissioner typically offers this evidence through the testimony of a vocational expert [("VE")] responding to a hypothetical that incorporates the claimant's limitations." *Id.* (quoting *Mascio*, 780 F.3d at 635). If the claimant can perform other work, the ALJ will find her "not disabled." 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v). If she cannot perform other work, the ALJ will find her "disabled." *Id.*

Applying the sequential evaluation process in this case, the ALJ concluded that Claimant had not engaged in substantial gainful activity since the date of his application for SSI benefits. (Tr. at 119.) She found that Claimant's obesity, degenerative disc disease, and right rotator cuff tear constituted "severe" impairments. (*Id.* at 119–23.) However, she found that those impairments, or a combination thereof, failed to meet or medically equal any of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. (*Id.* at 123.) Upon assessing Claimant's RFC, the ALJ determined that Claimant is able "to perform light work . . . except that he can never crawl or climb ladders, ropes, of [sic] scaffolds" and "he can occasionally balance, stoop, kneel, crouch, and climb ramps and

stairs." (*Id.* at 124.)  She further found that Claimant "can never reach overhead with the dominant, right upper extremity" but "can frequently reach in all other directions with the dominant, right upper extremity" and that "He can tolerate no exposure to hazards." (*Id.*)

The ALJ noted that Claimant "has no past relevant work." (*Id.* at 128.)  She further noted that he is "closely approaching advanced age" with "a limited education" and that "[t]ransferability of job skills [was] not an issue because [he] does not have past relevant work." (*Id.*)  Because the ALJ determined that Claimant was unable to perform the full range of light work, she enlisted a VE to aid in her finding that Claimant is capable of working as a price marker, garment bagger, or hand bander. (*Id.* at 128–29.)  As a result, the ALJ concluded that Claimant was not "under a disability . . . since September 27, 2016, the date the [SSI] application was filed." (*Id.* at 129.)

## II.    *LEGAL STANDARD*

This Court has a narrow role in reviewing the Commissioner's final decision to deny benefits: it "must uphold the factual findings of the [ALJ] if they are supported by substantial evidence and were reached through application of the correct legal standard." *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012) (quoting *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (per curiam)).  "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," and it must be "more than a mere scintilla." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019).  In other words, this Court "looks to [the] administrative record and asks whether it contains 'sufficient evidence' to support the agency's factual determinations." *Id.* (alteration omitted).  "[T]he threshold for such evidentiary sufficiency is not high." *Id.* "In reviewing for substantial evidence, [this Court] do[es] not undertake to reweigh

conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [ALJ]." *Johnson*, 434 F.3d at 653 (quoting *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996)). Even if "reasonable minds [could] differ as to whether a claimant is disabled," this Court upholds the ALJ's decision if it is supported by substantial evidence. *Id.* (quoting *Craig*, 76 F.3d at 589).

### III. ANALYSIS

Claimant argues that the RFC assessment fails to account for the full extent of his shoulder impairment. (ECF No. 13 at 5–11.) He further contends that the Appeals Council erred by rejecting evidence related to a shoulder surgery he had after the ALJ's written decision was issued. (*Id.* at 12–16.) Claimant asks this Court to reverse the Commissioner's decision and award him benefits or to reverse the Commissioner's decision and remand this matter to the ALJ. (*Id.* at 17.) The Commissioner responds that the ALJ properly conducted the RFC assessment based on the evidence before her and asserts that even if he is more limited than she found, the error is harmless because there is still work Claimant can perform. (ECF No. 17 at 11–15.) He also argues that the additional evidence submitted to the Appeals Council either provides no new information that was not in the record before the ALJ or relates to a time beyond the relevant period. (*Id.* at 15–19.)

#### A. RFC Assessment

Claimant argues that the ALJ did not explain her RFC assessment finding that his right shoulder impairment allowed him to frequently reach in all directions except overhead. (ECF No. 13 at 5–11.) "In the RFC assessment, the ALJ uses all relevant evidence, medical or otherwise, to determine a claimant's 'ability to meet the physical, mental, sensory, and other requirements of work.'" *Ladda v. Berryhill*, 749 F. App'x 166,

172 (4th Cir. 2018) (quoting 20 C.F.R. §§ 404.1545, 416.945). The ALJ's decision "must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations)." *Mascio v. Colvin*, 780 F.3d 632, 636 (4th Cir. 2015). "Thus, a proper RFC analysis has three components: (1) evidence, (2) logical explanation, and (3) conclusion." *Thomas v. Berryhill*, 916 F.3d 307, 311 (4th Cir. 2019). Stated another way, "the ALJ must both identify evidence that supports his conclusion and 'build an accurate and logical bridge from [that] evidence to his conclusion.'" *Woods v. Berryhill*, 888 F.3d 686, 694 (4th Cir. 2018) (emphasis deleted) (quoting *Monroe v. Colvin*, 826 F.3d 176, 189 (4th Cir. 2016)).

The ALJ in this case began her RFC assessment by summarizing Claimant's hearing testimony, in particular noting his statements that his January 2018 shoulder surgery "was not very successful with regard to function in his right shoulder" and that he planned to have a revision surgery in February 2019. (Tr. at 124.) She also recounted that he testified that he had "difficulty moving his right shoulder without assistance from his left upper extremity," had "no 'forward lift' in the right upper extremity," and was able to lift his right arm overhead "only with assistance from his left upper extremity." (*Id.*) In her review of the medical evidence of record, the ALJ detailed Claimant's treatment following his shoulder injury, including his March 2018 admissions "that he had failed to follow up with the orthopedic surgeon since surgery and he had not participated in any physical therapy" as well as physical examination findings of reduced range of motion and weakness in the right shoulder on various occasions in 2018. (*Id.* at 126.) She explained that she discounted Claimant's subjective complaints about his symptoms in part because emergency room staff treating him for his complaints of right shoulder pain and mental

health issues in late 2017 and early 2018 "described [him] as malingering and manipulative." (*Id.* at 127.) The ALJ also explained that she accorded "partial weight" to the state-agency consultants' opinions about Claimant's functional abilities but added restrictions for Claimant's right upper extremity based on the injury and subsequent surgery, which occurred after the state-agency consultants completed their reviews of the record. (*Id.*)

In short, the ALJ acknowledged that Claimant's right shoulder injury caused functional limitations, as demonstrated by his treating providers' objective physical examination findings, but she ultimately concluded that Claimant's statements about the extent of his functional abilities did not accurately reflect his level of functioning. To the extent Claimant suggests that the ALJ should have adopted his hearing testimony and incorporated it into the RFC assessment, she has no such obligation. *Vanhoose v. Saul*, No. 3:19-cv-00679, 2020 WL 4044326, at *11 (S.D.W. Va. July 2, 2020) (citing *Plummer v. Astrue*, No. 5:11-cv-00006-RLV-DSC, 2012 WL 1858844, at *3 (W.D.N.C. May 22, 2012)), *adopted by* 2020 WL 4042902 (S.D.W. Va. July 17, 2020). Rather, she is required to weigh Claimant's statements against other record evidence, including that of his "malingering behavior." *Long v. Astrue*, No. 6:10-cv-539-SB-KFM, 2011 WL 3844070, at *13 (D.S.C. Mar. 16, 2011) (citing *Gonzales v. Barnhart*, 465 F.3d 890, 895–96 (8th Cir. 2006)), *adopted by* 2011 WL 3847081 (D.S.C. Aug. 30, 2011).

Claimant also asserts that the ALJ erred by not discussing his October 26, 2018 follow-up consultation with an orthopedic surgeon. (ECF No. 13 at 8.) As an initial matter, "there is no rigid requirement that the ALJ specifically refer to every piece of evidence in [her] decision." *Reid v. Comm'r of Soc. Sec.*, 769 F.3d 861, 865 (4th Cir. 2014) (citing *Dyer v. Barnhart*, 395 F.3d 1206, 1211 (11th Cir. 2005) (per curiam)). But the ALJ

16

did in fact mention the appointment in her review of the medical evidence related to Claimant's shoulder impairment and noted that "surgery in February 2019 was discussed." (Tr. at 126.) Although she did not recount the orthopedic surgeon's physical examination findings that day, they do not appear fundamentally different from those of the orthopedic surgeon who evaluated Claimant only ten days earlier, which the ALJ summarized as "weakness and decreased range of motion in [Claimant's] right shoulder." (*Id.*; *see id.* at 951, 969.) Put simply, it is unclear how the second orthopedic surgeon's physical examination findings warrant a more restrictive RFC assessment.

Claimant also takes issue with the "partial weight" the ALJ gave to the opinions of the state-agency consultants because the opinions predated his shoulder injury. (ECF No. 13 at 8–10.) He implies that the ALJ should not have given them any weight at all, since they did not include restrictions for the use of his right upper extremity. (*Id.* at 9.) But the ALJ's discussion of the opinions makes clear that she effectively adopted the opinion of the state-agency consultant at the reconsideration level as the core of her RFC assessment, but she added restrictions "due to [Claimant's] issues with his shoulder." (Tr. at 127.) Notably, Claimant does not argue that he is limited to sedentary work or otherwise challenge the portions of the RFC assessment that the ALJ took from the opinion of the state-agency consultant at the reconsideration level. (ECF No. 13 at 8–10.) As such, he has not demonstrated why the "partial weight" the ALJ gave to the state-agency consultants' opinions is inappropriate.

Claimant's principal objection to the ALJ's RFC assessment is her failure to explicitly analyze why he can frequently, rather than occasionally, reach in all directions except overhead with his right upper extremity. (ECF No. 13 at 10–11.) Indeed, merely rehashing the evidence of record and stating an overarching conclusion without

17

explaining how the evidence cited supports that conclusion is inadequate. *Woods*, 888 F.3d at 694 (quoting *Monroe*, 826 F.3d at 189). The ALJ should have instead outlined how she determined that Claimant is capable of frequent reaching. *See Hendrix v. Berryhill*, No. 1:17-cv-00347-MR, 2019 WL 1317728, at *4 (W.D.N.C. Mar. 22, 2019).

However, the Commissioner argues that even if the ALJ incorrectly determined that Claimant can reach frequently, the VE testified at the hearing that jobs were available for a hypothetical individual who could reach only occasionally. (ECF No. 17 at 14–15.) To that end, "identification of even one occupation appropriate for Claimant fulfills the Commissioner's burden at the fifth step of the [sequential evaluation] process, so long as the occupation is available in significant numbers in the economy." *Kennerly v. Colvin*, No. 2:15-cv-01540, 2015 WL 9672913, at *13 (S.D.W. Va. Dec. 8, 2015) (citing 20 C.F.R. §§ 404.1566, 416.966), *adopted by* 2016 WL 93867 (S.D.W. Va. Jan. 7, 2016). The VE in this case testified that an individual with the same RFC as Claimant, except the individual could reach only occasionally with the right upper extremity in all directions except overhead, could work as a bakery products inspector, with 60,000 positions available nationally. (Tr. at 187.) It would appear, then, that the Commissioner could meet his burden, rendering Claimant not disabled even if he could reach only occasionally. *See Hicks v. Califano*, 600 F.2d 1048, 1051 n.2 (4th Cir. 1979) ("We do not think that the approximately 110 jobs [in the regional economy] testified by the [VE] constitute an insignificant number.").

"As a general proposition, [this Court] appl[ies] the harmless error doctrine in reviewing a decision of the Commissioner denying a benefits claim." *Keller v. Berryhill*, 754 F. App'x 193, 199 (4th Cir. 2018) (per curiam) (citing *Patterson v. Comm'r of Soc. Sec. Admin.*, 846 F.3d 656, 658 (4th Cir. 2017)); *see Sea "B" Mining Co. v. Addison*, 831

18

F.3d 244, 253 (4th Cir. 2016) ("The harmless error rule applies to agency action because if the agency's mistake did not affect the outcome, it would be senseless to vacate and remand for reconsideration."). "In order to merit remand or reversal, an ALJ's error must cause harm and not just a possibility of prejudice." *Keaton v. Colvin*, No. 3:15-cv-00588, 2017 WL 875477, at *4 (E.D. Va. Mar. 3, 2017) (footnote and internal citations omitted). Claimant "carries the burden of showing that prejudice resulted." *Id.* (quoting *Shinseki v. Sanders*, 556 U.S. 396, 409 (2009)). Because the VE testified that work would be available even if Claimant were limited to occasional reaching in all directions except overhead, Claimant has not shown prejudice here. As such, the undersigned **FINDS** that remand is not warranted despite the ALJ's failure to explain why she concluded that Claimant could reach frequently, rather than occasionally.

B. *New Evidence Submitted to Appeals Council*

Claimant contends that the ALJ's decision is not supported by substantial evidence because it does not account for his February 6, 2019 shoulder surgery and related postoperative treatment and restrictions. (ECF No. 13 at 12–16.) As an initial matter, to the extent Claimant challenges the Appeals Council's denial of his request for review, the denial itself is not reviewable under 42 U.S.C. § 405(g). *See Smith v. Berryhill*, 139 S. Ct. 1765, 1773 (2019) (explaining that § 405(g) permits judicial review of "final decision"); *Sims v. Apfel*, 530 U.S. 103, 106–07 (2000) (noting that when Appeals Council "denies the request for review, the ALJ's opinion becomes the final decision" of Commissioner); *Meyer v. Astrue*, 662 F.3d 700, 705 (4th Cir. 2011) (explaining that Appeals Council does not make "decision" under applicable regulations when it denies request for review). Instead, this Court, taking into account the newly submitted evidence considered by the Appeals Council, reviews the ALJ's decision for substantial evidence, just as it would do

when no additional evidence is submitted.  *See Meyer*, 662 F.3d at 707; *Flesher v. Colvin*, No. 2:14-cv-30661, 2016 WL 1271511, at *9 (S.D.W. Va. Mar. 31, 2016) (quoting *Wilkins v. Sec'y, Dep't of Health & Human Servs.*, 953 F.2d 93, 96 (4th Cir. 1991) (en banc)).  In doing so, this Court "focus[es] on determining whether [the] new evidence is contradictory, presents material competing testimony, or calls into doubt any decision grounded in the prior medical reports."  *Flesher*, 2016 WL 1271511, at *9 (internal quotation marks omitted).  Remand is appropriate only if the newly submitted evidence "impugn[s] the integrity of the [ALJ's] decision."  *Meyer v. Colvin*, 754 F.3d 251, 257 (4th Cir. 2014).

Here, the Appeals Council explained that that the February 6, 2019 and March 7, 2019 treatment notes and the April 1, 2019 "Medical Source Statement of Ability To Do Work-Related Activities (Physical)" form completed by the orthopedic surgeon who performed Claimant's February 6, 2019 shoulder surgery "do[] not relate to the period at issue." (Tr. at 2.)  The relevant period for an SSI claim is "the period on or before the date of the hearing decision," 20 C.F.R. § 416.1470(a)(5), which in this case was January 31, 2019 (Tr. at 114–34).  "Evidence 'relates to' the relevant period if it provides additional insight into impairments, symptoms, or functional limitations that the claimant suffered *while the ALJ was reviewing her case*, even if the additional evidence was created after the ALJ issued his decision."  *Katrinna S. v. Berryhill*, No. 5:17-cv-00119, 2019 WL 9075958, at *4 (W.D. Va. Feb. 5, 2019) (report and recommendation of magistrate judge) (emphasis supplied) (internal citations omitted).  Claimant asserts that the treatment notes "confirm the severity of limitations of the condition to be addressed by the surgery" and "further support [his] testimony as to his functional limitations in that area."  (ECF No. 13 at 16.)  But the treatment notes start on the date of his revision surgery and do not

purport to address his functioning prior to the procedure.  (Tr. at 75–78.)  Claimant acknowledges that the April 1, 2019 "Medical Source Statement of Ability To Do Work-Related Activities (Physical)" form "provides opinion as to the *anticipated* functional limitations . . . *going forward*."  (ECF No. 13 at 16 (emphasis supplied).)  Even Claimant appears to agree, then, that the form has no bearing on the status of his shoulder impairment prior to the ALJ's decision.  As such, the undersigned **FINDS** that the newly submitted evidence does not affect the ALJ's ultimate conclusion that Claimant is not disabled.

## IV.    CONCLUSION

For the foregoing reasons, the undersigned respectfully **RECOMMENDS** that the presiding District Judge **DENY** Claimant's request to reverse the Commissioner's decision (ECF No. 14), **GRANT** the Commissioner's request to affirm his decision (ECF No. 17), **AFFIRM** the final decision of the Commissioner, and **DISMISS** this action from the Court's docket.

The parties are notified that this Proposed Findings and Recommendation is hereby **FILED** and a copy will be submitted to the Honorable David A. Faber, Senior United States District Judge.  Pursuant to the provisions of 28 U.S.C. § 636(b)(1)(B) and Federal Rule of Civil Procedure 72(b), the parties shall have fourteen (14) days from the date of the filing of this Proposed Findings and Recommendation to file with the Clerk of this Court specific written objections identifying the portions of the Proposed Findings and Recommendation to which objection is made and the basis of such objection. Extension of this time period may be granted for good cause shown.  Copies of any objections shall be served on opposing parties and provided to Judge Faber.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Fourth Circuit Court of Appeals.  28 U.S.C. § 636(b)(1); *see Thomas v. Arn*, 474 U.S. 140, 155 (1985); *Snyder v. Ridenour*, 889 F.2d 1363, 1366 (4th Cir. 1989); *Wright v. Collins*, 766 F.2d 841, 846 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91, 94 (4th Cir. 1984).

The Clerk is **DIRECTED** to file this Proposed Findings and Recommendation and to transmit a copy of the same to counsel of record.

ENTER: January 25, 2021

Dwane L. Tinsley
United States Magistrate Judge